JACKSON, *ex dem.* WILLIAM HENDERSON, plaintiff in error, against JOHN I. DAVENPORT, defendant in error.

JACKSON
v.
DAVENPORT.

IN ERROR to the Supreme Court. The plaintiff brought an action of ejectment in the Supreme Court, to recover part of lot number forty, in the township of *Ulysses*, in the county of *Tompkins*. The cause was tried at the *Tompkins* circuit, in *June*, 1821, before Mr. Justice *Van Ness*, when the jury found a special verdict, which contained the facts as stated in the report of the case between the same parties, in the Supreme Court, Vol. 18. p. 295. 303. It also found, that the deed from *Alexander Kidd* to *Isaac Bogart*, and which contained the power of attorney to convey the premises in fee to *J. B.* and on which the plaintiff's title depended, was duly deposited in the office of the clerk of the county of *Albany*, pursuant to the statute, on the 27th *April*, 1794 : and that the subsequent deed from *A. K.* to *Lemuel Cobb*, from whom the defendant derived title, was also duly deposited in the office of the clerk of *Albany*, pursuant to the statute, on the 20th *March*, 1795 : both deeds being so deposited before the 1st *May*, 1795, the time prescribed by the statute. (1 *N. R. L.* 299. sess. 17. ch. 1.) The Supreme Court gave judgment for the plaintiff, as follows: " Whereupon, all and singular the premises being seen, and by the said Court now fully understood, and mature deliberation being thereupon had, for that it seems to the said Court upon the whole matter aforesaid, above in form aforesaid found, that the said *John I. Davenport* is guilty of the said trespass in ejectment, in the said declaration above imputed to him, in manner and form as the said *James Jackson*

*K.* being entitled to military bounty lands, by deed, dated *January* 12th, 1788, for a valuable consideration, granted, bargained, and sold, to *B.* all the bounty lands to which he was entitled; and in the same deed, he empowered *H.* and *G.*, or either of them, as his attorneys, or attorney, for him, and in his name, to grant, bargain, and convey the same lands, to *B.*, his heirs and assigns, in case the same should be necessary, upon the grant having passed the great seal of the state, to him, for such bounty lands. Afterwards, on the 8th *July*, 1790, a patent, in the usual form, was issued to *K.* the soldier, who, on the 25th *February*, 1792,

for a valuable consideration, by deed, granted, bargained, and conveyed the lands to *C.* his heirs and assigns, for ever.

On the 9th *February*, 1802, *H.* as the attorney of *K.* in his name, executed a *release to B. in fee*, of the land, in pursuance of the *power* contained in the first deed from *K.* to *B.* *Held*, that the first deed from *K.* to *B.* conveyed a life estate only ; and *K.* having, before the execution of the power, conveyed the *reversion*, for a valuable consideration, to *C.* a *bona fide* purchaser, without any notice of the prior deed of *K.*, *C.* became seised of the legal estate, or reversion, on the death of *B.*

The doctrine, that a deed executing a *power*, generally speaking, relates back to the instrument creating the power, so as to take effect from the original deed, is a fiction of law for the advancement of right ; and is not to be applied to the injury of a stranger, by defeating his lawful intervening rights.

IN ERROR.

ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

has above thereof declared against him : Therefore, it is consi-dered, that the said *James Jackson* do recover against the said *John I. Davenport*, his damages aforesaid, by the jurors aforesaid, in form aforesaid assessed ; and also one hun-dred and eleven dollars and eighty-three cents, for his costs and charges aforesaid, to the said *J. J.* by the court now here, with his assent, of increase, adjudged, which said dama-ges in the whole amount to one hundred and eleven dollars and eighty-nine cents ; and the said *John I. Davenport*, in mercy," &c. "And upon this, the said *James Jackson* prays the writ of the people, to the Sheriff of the county of *Tomp-kins*, aforesaid, to be directed, to cause him to have posses-sion of his term aforesaid, yet to come, and unexpired, of and in the tenements aforesaid, with the appurtenances. But, because upon the matters aforesaid, by the jurors aforesaid, in form aforesaid found, it seems to the Court now here, that the said *James Jackson* was possessed of his said term, of and in the said tenement, during the life of the said *Isaac Bogart* only ; and that the estate is determined by the death of the said *Isaac Bogart :* Therefore, it is fur-ther considered, that no writ of the said people, to cause the said *James Jackson* to have possession of his term afore-said, of and in the tenements aforesaid, or any part thereof, be granted to him ; but that the same be perpetually stay-ed," &c. Upon this judgment the writ of error was brought, returnable to this Court.

The *Chief Justice* assigned the reasons for the judg-ment of the Supreme Court, for which see *S. C.* 18 Vol. 299—303.

*T. I. Oakley*, and *J. Duer*, for the plaintiff in error, con-tended, 1. That the deed from *Kidd* to *Bogart*, purports to convey a fee. *Kidd* would be estopped, by this deed, from saying, that he had no such estate, at the time of its execu-tion. (1 *Johns. Cases*, 90. 12 *Johns. Rep.* 203, 204. 13 *Johns. Rep.* 316.)

2. The subsequent deed, executed by the attorney of *K.* to *B.*, operated, by relation, from the creation of the power

contained in the first deed, so as to vest him with the whole estate, from that time. A deed executed in pursuance of an agreement to convey, relates back to the date of the agreement, so as to give effect to an intermediate conveyance by the grantee. (1 *Johns. Cases*, 81. *2 Johns. Rep.* 510.) The *power* contained in the first deed is in the nature of an *agreement*, on the part of *K.*, to convey the fee to *B.*; and when that agreement was carried into effect, by the attorney, the deed related back to the time of the first deed, or date of the agreement. When an estate is created under a power, the grantee is in under the power, and takes the estate as if " all that was in the instrument executing the power had been expressed in that creating the power." (*Cruise's Dig.* tit. 32. *Deed.* ch. 16. s. 62, 63, 64, 65. 3 *Johns. Cases,* 548, 549.) The deed, therefore, executed by the attorney of *K.* to *B.*, operated, as if the granting words of it had been contained in the first deed of *K.* to *B.*; and, of course, passed the fee.

Again, the deed from *K.* to *B.* passed *all the interest* which the grantor had in the land. The soldier had only an *equitable* interest in the land, at the time of the deed. (10 *Johns. Rep.* 505. *Act*, sess. 13. ch. 59. s. 5.) Such an interest was of the highest kind, or an interest *in fee*, and could be entirely granted, without any words of inheritance. A *cestui que trust* will take a fee, without the word heirs, when a less estate will not satisfy the intent of the parties.

The *equity* of the case is clearly with the plaintiff, who purchased the whole estate of *K.* in the land, for a valuable consideration. He took a deed for all the estate of the soldier, which he deposited in the clerk's office, in conformity with the statute. The defendant claims, under a subsequent deed, from the same soldier. The attempt on his part is to set up the act of *K.* to defeat an estate granted by himself.

The act of *April* 6, 1790, provides, that all grants, and " other dispositions" of the land, by the soldier, before the issuing of the patent, shall be valid. The intent of this act was not " to devest, but to confirm and enlarge the interest before granted." (10 *Johns. Rep.* 504.) But if the defendant's doctrine is to prevail, the statute, instead of confirming and enlarging the estate granted by *K.* to *B.*, will

have the effect of enabling *K.* to destroy that estate, by turning an equitable estate in fee, into a legal estate for life; and to revoke a power, by a new grant of the land, after the patent, which he could not have done before it issued. Such a doctrine is, manifestly, against equity, and the acknowledged intent and policy of the statute. It rests on the principle of law, that a power to a stranger, having himself no interest whatever in the land, is a naked power, always revocable by the donor, until it is executed. (1 *Sid.* 15. *Hard.* 415. 1 *Caines' Cases in Error,* 15.) Such a power is said to be *simply collateral.* (*Sugd. on Powers,* 2d *Ed.* 48.) Where a power is given to a person having an interest in the land, to create some estate in it, for the benefit of a *third person,* it is said to be a power coupled with an interest, or a power relating to land. (*Powell on Powers,* 10, 11. *Sugd.* 46.) And such a power is either *appendant,* when the power is annexed to the estate of the donor, and to be executed out of that estate, or *in gross,* where it takes effect in the appointee, out of the estate remaining in the appointor; as in case of a tenant for life, with power to create an estate, to take effect after the expiration of his own. A power to a stranger, to charge an estate for his own benefit, is not *simply collateral,* though he has *no interest in the land;* and this shows that the general rule, as given, is not true. The true question is, who has an *interest in the power;* not who has an interest in the land.

Then, what are the characteristics of a *naked* or *simply collateral* power? (1.) The estate, on which the power is to operate, remains in the donor or grantor of the power, until it is executed, except as to powers of revocation. (2.) Such power is to be executed for the benefit of the grantor, or to answer some object or purpose in which he *claims an interest,* or to affect an estate *over which he has a control,* notwithstanding the creation of the power. (*Bergen* v. *Bennet,* 1 *Caines' Cases in Error,* 13. *arguendo.*) (3.) Such a power is created without any valuable consideration, moving to the donor from the appointee under the power, and is always to be construed strictly. (*Cowp.* 263.) In these cases, the donor retains the estate, subject to his disposal, until the power takes effect; the appointee having paid no valuable con-

IN ERROR.
. . . . . . .
ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

sideration for the estate to be created by the power, the power itself is entirely voluntary on the part of the donor, and the appointee cannot compel an execution of the power. In all these cases, therefore, the donor has, of course, the power under his control.

Now, to compare the power in the present case, with the one just described. The power must be considered as it was, at the time of its creation by the deed from K. to B. If it was *then irrevocable* by K., as between him and B., the statute and the patent, subsequently issued, cannot alter its nature, to the prejudice of B. No estate remained in K. after the creation of that power, which was to be executed solely for the benefit of B., the appointee. The *power* is contained in the very instrument granting the estate, and is part of the estate purchased by B., and for which he paid a valuable consideration to K., who, after the patent issued to him, was a naked trustee for B., and might have been compelled to convey the fee to him. The power, therefore, was not voluntary. Both K., and his attorney, might have been compelled to execute it. It is the case of a mere trustee creating a power, to turn the equitable estate of his *cestui que trust* into a legal estate. The power could not have been created in any other manner. A power cannot be given to a man to enlarge his own estate. B. could not have executed this power, if it had been given to himself. Then the question is, could K., in any way, revoke such a power as this? It is, certainly, against equity, and every principle of justice. Powers operating under the statute of uses, are to be construed as liberally at law as in equity. (*Woolston* v. *Woolston*, 1 *Bl. Rep.* 281.) They should be construed liberally, so as to effectuate the *intent* of the parties. Suppose, the case of a purchase of an estate, and a valuable consideration paid, and a power given by the vendor to a stranger, to convey the estate to the purchaser, could the donor revoke the power? Powers operate under the statute of uses, by the substitution of a new use in the place of a former one, which new use is executed by the statute, and the former uses cease. (*Cruise's Dig.* tit. 32. *Deed,* ch. 15. s. 65. 61.) If the power, in this case, is executed, no new use springs out

IN ERROR.

ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

of the estate of *K.*; as *B.* was seised of the entire use, by the first conveyance, being clearly the *cestui que trust* in fee. This shows that the power is inseparably connected with the interest of *B.*, in the land. It was a part of the purchase made. It was to be executed entirely for his benefit. It could operate only on the estate already possessed by him. No other person could have any interest in the execution or revocation of the power. Again, that *B.* had an *interest* in the power, connected with his interest in the land, may be tested, by the inquiry, whether the power could not have been *released* by him. For it is a settled principle, that a simply collateral, or mere naked power, cannot be released or extinguished by any act of the donee. (*Powell on Powers*, 8, 9. *Cruise's Dig.* tit. 32. *Deed*, ch. 20. s. 10. *Co. Litt.* 265 *b.* *Harg. & Butler's Notes*, 298.) If a feoffee to uses (before the statute of uses) was impowered by will, by the *cestui que use*, to sell the land, this was a simply collateral, or naked power. If the feoffee made a feoffment once, he still might sell the land under the power, as his feoffment did not extinguish the power. This shows that a feoffee to uses had no such interest in the land, as to enable him to control a power given to himself. A trustee, now, is what a feoffee to uses was, before the statute. It would follow, then, that a *trustee* can do no act to defeat a power, in the execution of which his *cestui que trust* has an interest.

Did the deed, then, from *K.* to *Cobb*, destroy this power? *K.*, at most, was a mere trustee. He had no interest in the land with which a power could be coupled, or to which it could relate. A power must relate, either to the interest of the donor or of the appointee. In this case, it cannot relate to the interest of *K.*, the donor, and must, therefore, be connected with the interest of *B.*, the appointee. The deed from *K.* to *Cobb*, being a bargain and sale, if it operates at all, must operate under the statute of uses. But had *K.* any use in the estate, which could pass by such a deed?

*Collier*, contra. 1. The deed from *K.* to *J. B.* being without words of inheritance, conveyed only an estate for life, which was determined by the death of *J. B.*, pending the suit, and before judgment in the Court below. To

create an estate *in fee*, the word *heirs* is absolutely neces-
sary. (1 *Co*. 100.) A bargain and sale of land to *A*. " to hold
the same *in trust*, for *B*. and *C*., their respective heirs and
assigns, for ever, in fee simple," creates a life estate only in
*A*., and at his death, the estate reverts to the grantor ; and
*B*. and *C*. can only resort to a Court of equity to enforce
the trust. (*Jackson* v. *Myers*, 3 *Johns. Rep*. 388.) But it
is said, that this is a peculiar case ; that *K*. was not seised
at the time he sold to *B*., but had only an equitable title or
claim on the government for the land. To this we answer,
that by the statute, (sess. 13. ch. 59.) the patents for these
military lands, are to issue to the soldiers, their heirs and
assigns, and the lands are to be deemed and adjudged " to
have vested in the respective grantees, their heirs and as-
signs, on the 27th *March*, A. D. 1783 ; and all grants, bar-
gains, sales, devises, and other dispositions, made by any of
the said grantors, or their heirs or assigns, of the said lands,"
&c. between the said 27th *March*, 1783, and the date of the
patent, shall be as good and effectual, as if the said letters
patent had been granted on the said 27th *March*." A
Court of law, then, at least, is bound to give the same con-
struction and effect to the deeds of these soldiers, as if the
patent had, in fact, been issued prior to their deeds. " Courts
of law," says *Kent*, Ch. J., " when any such conveyances
are brought before them, are to give them the same opera-
tion, as if they had been executed by the party seised, and
such have been the decisions of the Supreme Court." (10
*Johns. Rep*. 504.)

2. The lessor of the plaintiff derived no title under the
release of the 9th *February*, 1812, from *Henry J. B*. to *J.
B*., by virtue of the power contained in the deed from *K*.
to *J. B. :* (1) Because, being a mere naked power, not
coupled with any interest, it was revocable, and was, in fact,
revoked by the subsequent deed from *K*. to *Cobb*. (*Osgood*
v. *Franklin*, 2 *Johns. Ch. Rep*. 1. 19. 14 *Johns. Rep*.
527. *Jackson* v. *Given*, 16 *Johns. Rep*. 167. *Co. Litt*.
112 *b*. 113 *a*. 181 *b*. 1 *Caines' Cases in Error*, 1.) If a
man makes a letter of attorney, to make livery, he may re-
voke it, before it is executed ; but if it has been lawfully
executed, it cannot be revoked. A mere naked power is

revocable, at the pleasure of the grantor, during his life, and is revoked by his death; and it may be revoked by a deed, or by any act of equal solemnity, inconsistent with the power delegated. (*Powell on Powers*, 112. 116. 253, 254. *Shepherd's Touchst.* 525. 10 *Co.* 143 *b*. *Comyn's Dig. Uses.* L. 4.) If an infant conveys during his minority, a conveyance to another person, after the grantor arrives at full age, is of itself a revocation of the former grant. (*Jackson* v. *Carpenter*, 11 *Johns. Rep.* 530. *Jackson* v. *Burchin*, 14 *Johns. Rep.* 124.

The only question seems to be, what is a power coupled with an interest, within the meaning of the rule? " Powers relating to the land, are those which are given to some person having an estate or interest in the land over which they are to be exercised." (4 *Cruise's Dig.* 229. tit. 32. ch. 20. s. 49.) " Those powers which are reserved to the owner of the land, or to a person deriving under the instrument creating the power either a present or future estate, or interest, in the land, are said to be *relating to the land*." (*Harg. & Butler's Notes. Co. Litt.* 342. n. 1.) A power simply collateral, or a naked power, is where authority is given to a mere stranger, disposing of an interest, in which he had not before, nor has, by the instrument, creating the power, any estate whatever. (*Powell on Powers*, 8, 9. 1 *Caines' Cases in Error*, 15, 16, 17. 1 *Inst.* 52 *b*.) " The grantee of such a power having no interest connected with the power, has, of course, no interest in the revocation. (Per KENT, J. 1 *Caines' Cases in Error*, 17.) A power coupled with an interest, then, within the meaning of the rule, is where the power and the interest are united in the same person. " It is the possession of the legal estate, or right in the subject matter over which the power is to be exercised, that makes the interest in question." (Per KENT, J. 1 *Caines' Cases in Error*, 16.)

In most of the cases of powers given to executors to sell, either creditors or legatees have an interest; and, most frequently, there is an interest under the will, or the instrument creating the power. (16 *Johns. Rep.* 167. 14 *Johns. Rep.* 554. 3 *Binney's Rep.* 69. *Dyer*, 177 *a*. pl. 22.) It is true, that in a Court of Equity an equitable interest is

deemed sufficient. If executors are charged with a *trust* relative to the estate, depending on the power to sell, the power, in Chancery, will be held to survive, because, it is a rule of that Court, that a trust will not be permitted to fail for want of a trustee. (2 *Johns. Ch. Rep.* 20, 21.) But if a power be given to executors, who have no legal or equitable interest in the subject, it will be held, even in a Court of equity, as a mere naked power ; and if one of the co-executors dies, the power does not survive. (14 *Johns. Rep.* 527. *Bull* v. *Bull*, 3 *Day's Rep.* 384.) That the power, in this case, was contained in the same instrument, can make no difference. (18 *Johns. Rep.* 301.) " If a power is in another deed executed at the same time, it is tantamount, as if it was in the same deed by which the uses are limited." (1 *Ventr.* 279. *Comyn's Dig.* tit. *Uses*, L. 2.)

(2) Because, the reversionary interest remaining in *K.*, passed, by the deed, to *Cobb*, who was a *bona fide* purchaser, without notice, and could not be affected by the subsequent release from *H. J. B.* to *J. B.* If *K.* is to be deemed seised of the fee, as of the 27th of *March*, 1783, by operation of the statute, and the deed from *K.* to *B.*, for want of words of inheritance, conveyed only a life estate, it follows, of course, that the reversion remained in *K.* But, it is contended, that the power, and the deed given under the power, are to be regarded as one instrument, and relate to the time of the creation of the power. It is true, the party takes under the authority of the power ; but not from the time of the creation of the power. (*The Duke of Marlborough* v. *Lord Godolphin*, 2 *Vesey*, 78. *Cruise's Dig.* tit. 32. ch. 16. s. 63. 3 *Johns. Ch. Rep.* 550.) It is not a relation to make things vest from the time of the power, but from the time of the act executing the power. The cases to show, that a deed executed under an agreement to sell, relate back to the time of the first contract, are all cases where the rights of third persons are not affected ; or where the doctrine is applied to give effect to some intermediate disposition of the land, as where the vendee, after the contract, has undertaken to convey. (1 *Johns. Cases*, 81. 90. 2 *Johns. Rep.* 510.) A deed will not take effect, by re-

lation, except between the same parties, and for the advancement of justice. (4 *Johns. Rep.* 230. 3 *Caines' Rep.* 263. 12 *Johns. Rep.* 140. 1 *Johns. Ch. Rep.* 297, 298.)

(3) Because, the conveyance from *J. B.* to *T. Fowler*, being a mere quit claim, and without covenants of warranty, the subsequent release from *H. J. B.* to *J. B.*, did not enure for the benefit of the lessor of the plaintiff; but, if it had any operation upon the reversionary interest, it vested it in *J. B.*, and thus showed a subsisting title out of the lessor of the plaintiff.

Where a person, having an interest in land, conveys it by deed *with warranty*, and, afterwards, purchases the same land, it shall enure, as between them, in pleading, by way of *estoppel*, for the benefit of the grantee ; (1 *Johns. Cases,* 90, 91. 13 *Johns. Rep.* 316. *Co. Litt.* 265 a.) but no title not then *in esse,* will pass, unless there is a warranty in the deed ; and then it operates by way of estoppel, to avoid circuity of action. (14 *Johns. Rep.* 193, 194.) All the authorities put it on the ground of an estoppel ; but a stranger cannot take advantage of, nor is he bound by the estoppel. (*Co. Litt.* 352 a. 3 *Johns. Cases,* 103. *Cro. Car.* 109, 110.) Estoppels are not favoured in law.

3. It is admitted, that in a Court of equity, the deed from *K.* to *B.* would, if there were no intervening rights of third persons to be affected, be sufficient to create a trust in fee, without the word heirs. But, as by the act of *April* 6, 1790, the patentee or soldier is deemed to be seised of the land on the 27th of *March,* 1783, we contend, that a Court of law, in cases arising under the act, must be governed by the ordinary rules of conveyance, and is bound to give the same operation to the deed, as if executed by the party seised. (*Fisher* v. *Fields,* 10 *Johns. Rep.* 495. 504.) And, even in a Court of equity, *Cobb,* being a *bona fide* purchaser without notice, would hold the reversion discharged of the trust. (2 *Fonbl. Equ. Cas.* 146, 147. 4 *Johns. Ch. Rep.* 136. 1 *Johns. Ch. Rep.* 566. 575. 2 *Vernon,* 271. *Sugden's L. of V.* 476. *Comyn's Dig.* tit. *Chancery.* 4 *W.* 2. 4 *W.* 29.) A mere equitable title cannot be set up at law against the legal estate. (2 *Johns. Rep.* 221. 84. 3 *Johns. Rep.* 424. 8 *Johns. Rep.* 487. 16 *Johns. Rep.* 305.)

THE CHANCELLOR. The facts of this case lie in a nar-
row compass.

*Alexander Kidd*, a soldier, was entitled to lot No. 40 in
*Ulysses*, and a patent for the lot issued to him on the 8th of
*July*, 1790. By the act of the legislature of the 6th of
*April*, 1790, (sess. 13. ch. 59. s. 5.) the land was to be
deemed vested in every such grantee from the 27th of
*March*, 1783, and all his intermediate sales and dispositions
thereof, were to be deemed equally good and effectual as if
the letters patent had actually issued on that day. *Kidd*, by
deed of 12th of *January*, 1788, sold all his interest, as a soldier,
in the military bounty lands, to *Isaac Bogart*, for the considera-
tion of nine pounds. The deed contained no words of inheri-
tance, and it, therefore, conveyed only a life estate in the lands
to *Bogart;* but it empowered two other persons named in the
deed, or either of them, to convey the land in fee to *Bogart*,
in case the same should afterwards be deemed necessary.

It is very probable, that *Kidd* intended, by that deed, to
sell to *Bogart* all his interest in the military bounty lands ;
and the power contained in the deed to execute a subsequent
conveyance in fee, was to provide for the consummation of
the title as soon as the patent should issue. The patent
did, afterwards, issue to *Kidd*, and he became seised in fee
of the lot in question, except so far as he had, in the inter-
mediate time, parted with his legal title to *Bogart*. He had
only parted with a life estate, but with authority to his at-
torney to release the fee, which that attorney omitted to
do, until long after *Kidd* had sold to *Cobb* his reversionary
interest in the lot. The deed from *Kidd* to *Cobb*, was made
on the 25th of *February*, 1792, and it conveyed, for the
consideration of ten pounds, all his interest in the military
bounty lands ; and to this deed was annexed his discharge as
a soldier from the *American* army in 1783.

The deed to *Bogart* of the life estate, with a power to
convey the fee, was deposited in the clerk's office in *Albany*,
in *April*, 1794, and the subsequent deed to *Cobb*, conveying
the reversion in fee, was deposited in the same office in
*March*, 1795. Both deeds were deposited in season ; and
both stood upon an equal footing, so far as the deposit
was concerned, for the law made no distinction as to the

*time* of the deposits, if made before the first of *May*, 1795. The deed to *Cobb* was duly recorded in *Cayuga* county, in *June*, 1813, and the deed to *Bogart* not before *May*, 1818.

Here, then, we have two distinct deductions of titles; the deed to *Bogart*, under which *Henderson*, the lessor of the plaintiff, claims, and the deed to *Cobb*, under which *Davenport*, the defendant, claims; and the question is, whether the reversionary interest in the land, which resided in *Kidd*, subject to the life estate in *Bogart*, was legally conveyed to *Cobb*, so as to enable him to hold, in opposition to the subsequent execution of the power contained in the deed to *Bogart*.

When *Cobb* purchased of the soldier, in 1792, he purchased *bona fide*, for a valuable consideration, without any notice of the prior deed to *Bogart*; and if *Kidd*, the soldier, had any legal estate remaining in himself, which could be conveyed by him, it must have passed to *Cobb*. I cannot perceive any room for doubt upon this point. *Bogart* had only a life estate, owing to the imperfection of his deed, and that deed, imperfect as it was, would have been sufficient in equity, as against *Kidd*, or as against any person purchasing from him with notice of it. But *Cobb* had not any notice of that deed; and if *Kidd* had a legal capacity to convey his reversion, it must have legally vested in *Cobb*; and it appears to me, it could not have been legally devested by any of the subsequent events.

Admitting that *Kidd's* power of attorney, to release his interest to *Bogart*, could not lawfully be revoked, yet the release was not, in fact, executed, and the reversion in fee did, in judgment of law, reside in *Kidd*, when he conveyed it to *Cobb*, in 1792. It was a breach of trust, or of good faith in *Kidd*; but *Cobb* ought not to be affected by it, for he was a stranger to the deed to *Bogart*, and to its contents. The power of attorney was not a legal lien or incumbrance upon the land, affecting a stranger who dealt with *Kidd*, without notice of it. The most that can be said is, that *Kidd* held the reversion, subject to the power, or as trustee for *Bogart*. But *Cobb* did not know that *Kidd* had incapacitated himself, in a moral and equitable view, from conveying the reversion to him, or that he had already authorized an attorney to convey it to *Bogart*. Though a trus-

tee conveys away the trust subject, in breach of his trust, yet if he had the legal title, and the person who took it from him, for a valuable consideration, had no notice of the trust, he will hold the land discharged of the trust. It appears to me impossible to maintain, that *Kidd* had no legal capacity to convey his reversionary interest. Whoever has the legal title can convey it, if he be under no legal disability. If he holds the land in trust, or if he be under a contract to convey, or has given a power of attorney to a third person to convey, all these may be obligations resting upon his conscience, and disabling him in equity to convey; but still, if he does convey, and to a person who has no knowledge, and is not chargeable with any knowledge of these equitable impediments, and who pays a valuable consideration, the purchaser will hold, and the party injured must look to him who has broken his trust, or violated his duty.

The events subsequent to the conveyance to *Cobb*, are these : *Bogart* sold to *Fowler*, in 1791, and *Fowler* to *Henderson*, the plaintiff in error, in 1792 ; neither of those deeds were recorded until 1818 ; and in that year, *Bogart* died, and his life estate terminated. There was no release under the power of attorney contained in the deed to *Bogart*, until 1802, which was ten years after *Kidd* had anticipated the execution of that power by conveying the same reversionary interest to *Cobb*. This release or execution of the power, in 1802, was never recorded, and when *Cobb* sold and conveyed to the defendant, *Davenport*, in 1815, for 1000 dollars, (and which deed was immediately recorded,) the defendant had no knowledge of the release to *Bogart*. If he knew of the power, he had no reason to presume that it could ever be executed, considering that 27 years had elapsed between the time of the original purchase by *Bogart*, and the purchase by the defendant from *Cobb*, and that 25 years had elapsed since the issuing of the patent, when, according to the language of the deed to *Bogart*, the power was intended to be executed. *Davenport*, the purchaser from *Cobb*, had good reason to presume, that if any execution of the power existed, it would have appeared upon record, for the statute required all deeds, affecting in law or equity the military lands, to be recorded. But

IN ERROR.
∘∘∘∘∘∘∘

ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

IN ERROR.
.......
ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

whether the defendant had notice or not, is immaterial, provided the deed to *Cobb* was valid, and conveyed a title unaffected by the power. Whatever title *Cobb* had, the defendant would take, with or without notice.

The case, then, appears to resolve itself into this single point : Did the execution of the power contained in *Kidd's* deed to *Bogart*, by a release of the fee to *Bogart*, in 1802, overreach and destroy the intermediate release to *Cobb*, in 1792 ? I am of opinion that it did not ; and I do not put the cause upon the point, whether the power of attorney, contained in the original deed to *Bogart*, was, or was not, a power legally subject to revocation ; and whether *Kidd* could, or could not, revoke it, as between him and *Bogart*.   I put my opinion upon this ground : That the reversionary estate in fee in the premises, after the original deed from *Kidd* to *Bogart*, continued to reside in *Kidd*, and that *Kidd* passed that interest to *Cobb*, prior to the execution of the power, and that *Cobb* was competent to take and to hold, inasmuch as he was a *bona fide* purchaser, without notice of the power, and was not to be affected by a subsequent execution of it. This ground appears to me to be just and solid, and founded equally on the rules of law and the principles of policy.

It cannot properly be said that *Kidd* did not continue seised of the reversion in fee, after his deed, in 1788, to *Bogart*. He had the entire fee in himself, and as he conveyed only a life estate to *B*. the residue must remain in him, and could only pass out of him by deed or by descent.   The power of attorney was no conveyance ; it was an authority to a stranger to convey the reversion to *Bogart* ; and until the execution of the power, the reversion continued as if no such power had been created.

It was suggested upon the argument, that a power of this kind could not be barred or extinguished by a conveyance ; and that when it was once executed, it would relate back to the time of the instrument creating the power.   Thus, the deed to *Bogart*, in 1788, contained a power of attorney to third persons, therein named, to convey the whole estate in fee to *Bogart* ; and the argument is, that when the power was executed, no matter when, whether in ten, twenty, or fifty years afterwards, it would relate back to the time of the

deed to *Bogart*, as that was the origin of the power, and would avoid all intermediate conveyances, contrary to it. I am not going to deny the general doctrine, that an estate created by the execution of a power, takes effect as if created by the original deed. (*Litt.* s. 169. *Co. Litt.* 113 a. and *Cook* v. *Duckenfield*, 2 *Atk.* 562—567.) But this is only to certain purposes, and as between the parties, and not as to the intervening rights of strangers to the power. A deed executing a power, is, in many respects, considered as a substantial independent instrument. Lord *Hardwicke* is said (2 *Vesey*, 65.) to have decided, that such a deed was a conveyance within the statute of *Elizabeth*, and liable to be affected by the provisions of the statute against fraudulent conveyances. It is a deed affecting land, within the registry acts ; and in countries where deeds are required to be recorded, it must be recorded as well as any other deed, otherwise, purchasers would be unable to discover whether the power had been executed, and would be liable to be defrauded. This was so decided in *Scrafton* v. *Quincey*, (2 *Vesey*, 413.) by Sir *John Strange*, the Master of the Rolls. That case appears to me to be quite decisive of this cause, for the deed under the power was never recorded ; and, therefore, the deed to *Cobb*, and the deed from *Cobb* to *Davenport*, the defendant, being duly recorded, are certainly entitled to preference. When the defendant purchased of *Cobb*, in 1815, it was impossible for him to guard himself against the secret execution of this power, for the evidence of the execution of the power was not upon record.

This doctrine, that a deed executing a power refers back to the instrument creating the power, so that the party is deemed to take under the deed from the grantor by whom the power was created, and not from the power, is a fiction of law, and so it was considered in *Bartlett* v. *Ramsden* ; (1 *Keb.* 570.) *relatio est fictio juris,* according to the resolution in *Menvil's* case ; (13 *Co.*) and is upheld to advance a right, not to advance a wrong, or to defeat collateral acts which are lawful, and especially if they concern strangers. This limitation of the fiction, so as to prevent it from doing injury to strangers, or defeating mesne lawful acts, is the common language of the books ; (4 *Johns. Rep.* 234. 12 *Johns.*

*Rep.* 144.    18 *Viner*, 287. B. pl. 2.    *Butler* and *Baker's* case, 3 *Co.* 25. 29 *a.* 2 *Vent.* 200.) and it received a very particular illustration by Lord *Hardwicke*, in the case of *Marlborough* v. *Godolphin*, (2 *Vesey*, 78.) He admitted the principle, that where a person takes by execution of a power, he takes under the *authority of the power ;* but there was no case, he said, to maintain that he must take, by relation, *from the time of the creation of the power.* The meaning of the rule was that persons taking under a power, must take in the same manner as if the power, and the instrument creating the power, had been incorporated in one instrument, but not in the same time.    The title is derived from the act creating the power, but the time of vesting of the right is the time of the act of execution of the power.    These executions of powers, says Lord *H.*, do not refer back, like assignments in commissions of bankruptcy ; for the latter refer back by force of the statutes of bankruptcy, to avoid mesne wrongful acts.    The same distinction was alluded to by Lord *Hardwicke,* in *Southby* v. *Stonehouse ;* (2 *Vesey,* 610.) and I am greatly mistaken, if this be not the plain common sense and manifest justice of the thing.    Any other construction would lead to fraud and intolerable abuse.

It is stated in the books as a general rule, that a simply collateral or naked power, cannot be barred or extinguished by disseisin, or by fine, feoffment, or other conveyance. (*Albanie's* case, 1 *Co.* 110.    *Digg's* case, 1 *Co.* 173.    *Edwards* v. *Slater*, *Hard.* 410.    *Willis* v. *Sherral*, 1 *Atk.* 479. 15 *Hen.* VII. fo. 11 *b.* cited and translated in Appendix No. 1. to *Sugden's Treatise of Powers.*)    It is said, for instance, that if a power to sell land be given to executors, and the heir of the testator enters and enfeoffs *B.*, who dies seised, yet the executors may sell, and the vendee will be in by the will, which is paramount to the descent, and that a descent which tolls an entry does not toll a power.    (*Jenk. Cent.* 184. pl. 75.    *Bro. Abr.* tit. *Devise*, pl. 36.    *Parsons,* Ch. J. in 5 *Mass. Rep.* 242.)    I presume, that I may venture, upon the strength of the authorities which have been previously mentioned, and upon the reason of the thing, to question the universality of the application of this rule, and to insist that it ought to be confined within reasonable limits.

If I have not misapprehended the cases on this subject, such a power cannot lay dormant and concealed, and then spring up, at any distance of time, and prevail against a conveyance from the person having the legal title, to a purchaser for valuable consideration, without notice of the power ; and especially, if the lands lie (as they do in this case) in a recording county, and the purchaser's deed be recorded before the deed under the power, and without knowledge of that deed.  So far, and no further, it is necessary to go in this case ; and I wish to be understood as confining my opinion to the circumstances of this case.  I conclude, then,

(1) That *Henderson*, the plaintiff, must make out his title to the fee under the execution of the power of attorney contained in the deed from *Kidd* to *Bogart* in 1788.

(2) That the release under that power operates as against the defendant, only from the time of its execution, in 1802, and is not to be carried back, by relation, to the date of the deed creating the power, so as to destroy the operation of the deed to *Cobb*, in 1792, and, consequently, the deed from him to the defendant, in 1815.  This would be to defeat an intervening vested right and title to the fee acquired by a third person, from the party having the legal title, without notice of the execution, or even of the existence of the power.  The deed to *Bogart*, containing the power, was not recorded until after the record of the purchase by the present defendant, and the subsequent deed, in execution of the power, was never recorded.  If a title so acquired under a power not recorded, was to prevail against a regular title fairly acquired, and duly recorded, without notice, it would be in vain to rely upon the provisions of the recording statutes.  A party need only create a power, and let it sleep for an age, unknown and undetected, and then awaken its potent energies, and sweep away the titles, and the hopes, and the fruits of a whole generation.  I cannot bring my mind to accede to any such mischievous doctrine ; and I am, for the reasons assigned, of opinion, that the judgment of the Supreme Court ought to be affirmed.

This being the unanimous opinion of the Court, it was, thereupon, ORDERED, ADJUDGED, and DECREED, that the

IN ERROR.

ALBANY,
Nov. 1822.

JACKSON
v.
DAVENPORT.

Nov. 11th.

IN ERROR.
•••••••
ALBANY,
Nov. 1822.

judgment of the Supreme Court, in this cause, be affirmed ; and that the plaintiff in error, pay to the defendant in error, his costs, to be taxed, in defending the writ of error in this Court ; and that the record be remitted, &c.

Judgment of affirmance.